UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SANTIAGO PUJALS, JR.,

                      Plaintiff,

           -against-

BDO USA, P.C.,

                     Defendant.

Case No. 1:25-cv-01757 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Plaintiff Santiago Pujals, Jr. ("Pujals" or "Plaintiff") brings claims for breach of a promissory note, anticipatory breach of a warrant, and breach of the covenant of good faith and fair dealing implied in both agreements. He alleges that Defendant BDO USA, P.C. ("BDO" or "Defendant") wrongfully terminated him without cause to coerce him into forfeiting millions of dollars owed under a promissory note and warrant arising from the firm's merger and restructuring. *See generally* Dkt. 49 ("Amended Complaint" or "Am. Compl."). Now before the Court is Defendant's motion to dismiss the Amended Complaint in its entirety for failure to state a claim on which relief can be granted. Dkt. 20 ("Mot."); Dkt. 21 ("Br."). For the reasons that follow, Defendant's motion to dismiss is GRANTED in part and DENIED in part.

## BACKGROUND

### I.    Factual Allegations

The following facts are drawn from the Amended Complaint and taken as true for purposes of this motion. *See Costin v. Glens Falls Hosp.*, 103 F.4th 946, 952 (2d Cir. 2024).

Plaintiff, a certified public accountant, became an equity partner at the Florida accounting firm Morrison Brown Argiz & Farra, P.A. ("MBAF") in 2001. Am. Compl. ¶¶ 1, 27-28. In

January 2020, MBAF merged with Defendant BDO, and Plaintiff became an equity partner at BDO with equity interests commensurate with his prior ownership in MBAF.  *Id.* ¶¶ 2-4, 29-30.

From July through August 2023, BDO underwent a corporate restructuring in connection with the creation of an Employee Stock Ownership Plan (the "ESOP").  *Id.* ¶¶ 5-9, 32-33.  As part of that transaction, BDO converted from a partnership to a professional association and then to a professional corporation, and former equity partners received shares in the new entity.  *Id.* ¶¶ 5-7, 33-36.  Plaintiff ultimately held 45,984 shares of BDO, which were valued at approximately $100 per share (or $4,598,400 total) at the time of the ESOP transaction.  *Id.* ¶¶ 35, 38.

In furtherance of BDO's restructuring efforts, all BDO shareholders sold forty-two percent of their shares to the ESOP.  *Id.* ¶¶ 7, 36.  However, select older shareholders, like Plaintiff, were given the option to sell all of their shares at the then-determined value of $100 per share.  *Id.* ¶¶ 10, 39.  Plaintiff, who was approaching retirement age at the time, elected to do so.  *Id.* ¶¶ 11, 39.  The transfer took place on August 31, 2023.  *Id.* ¶ 12.  In exchange, Plaintiff received cash for approximately thirty percent of his shares (valued at around $1.38 million) and a promissory note for the remaining seventy percent, under which BDO agreed to pay Plaintiff $3,218,865.09 plus 3.96% interest per annum.  *Id.* ¶¶ 11-13, 44; *see also* Dkt. 49-1 (the "Note").  Plaintiff also received a warrant granting him the right to purchase approximately 45,722 shares in BDO at a strike price of $58 per share.  Am. Compl. ¶¶ 14, 49; *see also* Dkt. 49-2 (the "Warrant").  According to the Amended Complaint, Plaintiff relinquished his right to participate in BDO's former lifetime defined retirement benefit plan in reliance on representations that the Note and Warrant would provide him with retirement security.  Am. Compl. ¶¶ 8, 39-40, 42.

Plaintiff contends that the Note and Warrant both provided that his rights would "fully vest" if he remained employed at BDO until his "retired date after age sixty-two," *id.* ¶¶ 45, 50;

2

*see also* Note at 3; Warrant at 14, and that forfeiture could occur only if Plaintiff were terminated for "cause," as defined in the Shareholders' Agreement, Am. Compl. ¶¶ 45, 51-58.  Plaintiff alleges that he turned sixty-two in April 2024, and that BDO's board did not terminate his employment "for cause." *Id.* ¶¶ 48, 54-57.

In January 2025, BDO executives allegedly demanded that Plaintiff agree to forgo approximately two-thirds of the amounts owed under the Note and to waive his rights under the Warrant, stating that BDO believed the agreed-upon compensation was excessive. *Id.* ¶ 16, 59-60; *see also* Dkt. 49-3 ("Draft Side Letter") (providing for reduction).  Plaintiff alleges that even though BDO expressed a desire that Plaintiff continue his employment, it threatened to terminate his employment if he refused to accept these reductions.  Am. Compl. ¶¶ 16, 59-67.  Other former MBAF equity partners were allegedly given the same ultimatum.  *Id.* ¶ 64.  Plaintiff rejected the proposed forfeiture.  *Id.* ¶¶ 63, 68.

On February 7, 2025, BDO terminated Plaintiff's employment.  *Id.* ¶¶ 20, 69.  Plaintiff alleges that the termination was not for "cause" or performance-related reasons, but rather because he refused to relinquish his contractual rights.  *Id.* ¶¶ 20-21, 55-57, 71-73.  Plaintiff therefore contends that this February 7, 2025 termination date was his "retired date," and that, because he had turned sixty-two the prior year, his rights under both the Note and Warrant are fully vested.  *Id.* ¶¶ 46, 74-75.  Accordingly, Plaintiff alleges that BDO has failed to make required interest payments under the Note and has repudiated its obligations under both agreements.  *Id.* ¶¶ 85-86, 93, 105.  BDO disagrees.  Having terminated Plaintiff's employment within three years of the Note's and Warrant's issuance, BDO takes the position that Plaintiff is owed nothing under either agreement.  *Id.* ¶¶ 20, 72; Br. at 5-7.

Plaintiff brings claims for breach of the Note, anticipatory breach of the Warrant, and breach of the implied covenant of good faith and fair dealing with respect to both agreements. Am. Compl. ¶¶ 79-112.

## II.    Procedural History

Plaintiff commenced this action on March 3, 2025.  *See* Dkt. 1 ("Complaint" or "Compl.").  On April 11, 2025, Defendant moved to dismiss the Complaint.  *See* Mot.; Br.; Dkt. 22 ("Reimink Decl").  Plaintiff filed an opposition, Dkt. 25 ("Opp."), and Defendant filed a reply, Dkt. 27 ("Reply").  Shortly thereafter, Plaintiff sought leave to file his Amended Complaint.  Dkt. 37.  After receiving and evaluating briefing from the parties, Dkts. 38, 40-43, the Court granted leave to amend and stated that it would address Defendant's arguments for dismissal in the context of the amended allegations, Dkt. 48 at 4-5.  To that end, the Court permitted "limited, supplemental briefing . . . to respond to any new allegations asserted in the [Amended Complaint]."  *Id.* at 5 n.1; *see also* Dkt. 50 ("Suppl. Br."); Dkt 51 ("Suppl. Opp.").  The motion is now fully briefed.  On February 11, 2026, the parties appeared before the Court for oral argument on Defendant's motion.  Dkt. 56-1 ("Tr.").

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain[] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (en banc) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The Court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in the plaintiff's favor."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)).  However, the Court shall not "accept as true a legal conclusion couched as a factual

allegation." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"Determining whether a complaint states a plausible claim" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  In making this determination, a court is generally limited to the "facts stated on the face of the complaint," as well as "documents appended to the complaint or incorporated in the complaint by reference," "matters of which judicial notice may be taken," and documents "integral to the complaint."  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)); *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  In breach-of-contract actions, "the complaint is deemed to incorporate the contract by reference because the contract is integral to the plaintiffs' claim." *Verzani v. Costco Wholesale Corp.*, 641 F. Supp. 2d 291, 297-98 (S.D.N.Y. 2009); *accord Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011).  Relevant here, "[w]here a document is referenced in a complaint, 'the documents control and this Court need not accept as true the allegations in the . . . complaint.'" *Tongue v. Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016) (quoting *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)).

## DISCUSSION[1]

Plaintiff's Amended Complaint consists of four counts: breach of the Note, anticipatory breach of the Warrant, and breach of the implied covenant of good faith and fair dealing with respect to each agreement.  Am. Compl. ¶¶ 79-112.  Defendant moves to dismiss all four claims. *See generally* Br.  The Court addresses each in turn.

---

[1] Capitalized terms not otherwise defined herein refer to the terms as defined in the Note and Warrant.

## I.    Breach of the Promissory Note

Plaintiff alleges that Defendant breached the Note by failing to make payments owed thereunder.  Am. Compl. ¶¶ 79-94.  Defendant moves to dismiss, asserting that the Note unambiguously forecloses Plaintiff's claim because Plaintiff did not satisfy the contractual conditions for payment.  Br. at 5-10.  Because the Court finds that the Note's language is ambiguous, it will not dismiss Plaintiff's breach of Note claim at this time.

A promissory note is "[a]n unconditional written promise, signed by the maker, to pay absolutely and in any event a certain sum of money either to, or to the order of, the bearer or a designated person."  *Promissory Note*, Black's Law Dictionary (10th ed. 2014); *see also Lau v. Mezei*, No. 10-cv-04838 (KMW), 2011 WL 4501942, at *2 (S.D.N.Y. Sept. 29, 2011) ("As a written contract for the payment of money, promissory notes are governed by the common law of contracts."); *accord Brown v. 39 Spring St. LLC*, 229 N.Y.S.3d 16, 18 (N.Y. App. Div. 2025) ("[A] promissory note is a contract.").  By its terms, the "Note and all matters arising out of or related [t]hereto are governed and construed in accordance with the internal and substantive laws of the State of New York."  Note § 7.11.[2]  "Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages."  *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011); *accord 34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022).

The third element, breach, is the focus of the present motion.  Plaintiff contends that Defendant has breached the Note twice over.  First, Plaintiff alleges that Defendant failed to pay monthly interest provided for under Section 2.1 of the Note.  Am. Compl. ¶¶ 81-88, 93.  Second,

---

[2] Here, "[t]he parties' briefs assume that New York substantive law governs the [Note], and such implied consent is, of course, sufficient to establish the applicable choice of law."  *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (alteration adopted) (quoting *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001)); *see also* Br. at 2 n.3; Opp. at 1-3.

Plaintiff claims that Defendant failed to pay the Note's outstanding principal and accrued interest, as mandated by the acceleration clause in Section 3.2(a) — which was allegedly triggered automatically by Defendant's failure to make the interest payments. *Id.* ¶¶ 88-93. BDO disclaims any obligation to make either payment. Suppl. Br. at 1-3.

Defendant's repudiation is premised on the value of the Termination Amount provided for in the Note. Br. at 5-7. Article V of the Note states in relevant part:

> Upon termination of [Pujals]'s employment with [BDO] . . . , (a) a portion of this Note shall convert to a Retirement Note with a principal face amount equal to the Conversion Amount and (b) (i) if [Pujals] has reached [Pujals]'s Selected Age as of the date of such termination, [BDO] shall repay the remaining amount of the Termination Amount in cash or (ii) otherwise, the remainder of the Termination Amount shall be added to the Retirement Note in accordance with the terms thereof.

Note at 6-7. There are three scenarios that would preclude Plaintiff's entitlement to the Termination Amount: if Plaintiff (1) violates a noncompete with BDO, (2) subsequently works for a BDO competitor, or (3) is terminated for cause as defined in the Shareholders' Agreement. *Id.* at 4 (providing that the Termination Amount will be zero in those instances). Plaintiff contends that none apply to him, Opp. at 8, and Defendant does not argue otherwise, *see generally* Br.; Reply; Suppl. Br. *See CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 383 (S.D.N.Y. 2019) ("[A] party may be deemed to have conceded an argument by failing to address it in its briefing."). Thus, it is undisputed that Plaintiff, having reached his Selected Age of sixty "as of the date of [his] termination," is entitled to the Termination Amount. Note at 6-7.

The parties disagree, however, about the value of that entitlement.  Br. at 5 ("[Pujals]'s Termination Amount . . . is . . . $0."); Opp. at 8 ("The 'Termination Amount' is not zero[.]"). The Termination Amount and related Conversion Amount are derived through a formula consisting of various defined terms:[3]



Note at 4.  The key term is Plaintiff's "Conversion Percentage": a variable that ranges from 0% to 100% depending on the difference in time between the Note's "Original Issue Date" (August 31, 2023, *id.* at 3) and its "Conversion Date" (within 30 days after delivery of a written Conversion Notice to Pujals, *id.* at 7).  *Id.* at 2-3.  Below are the possible values:

| Conversion Date | Conversion Percentage |
|---|---|
| Before August 31, 2026 | 0% |
| Between August 31, 2026 and August 31, 2027 | 80% |
| Between August 31, 2027 and August 31, 2028 | 90% |
| After August 31, 2028 | 100% |

*Id.* at 2.

Plaintiff does not plead a Conversion Date, or lack thereof.  However, the parties agree that the Conversion Date precedes August 31, 2026.  Opp. at 8 ("The 'Conversion Percentage' might be 0% since [Pujals] was terminated before August 31, 2026[.]"); Br. at 6 ("Pujals's

---

[3] "Age Percentage" is defined by reference to Exhibit A of the Note, which provides for a value of 100% to a noteholder who, like Plaintiff, was over the age of sixty at the time of his termination.  Note at 2; *see also id.*, Ex. A.  Plaintiff's "Early Payment Percentage" is likewise 100% because his "Selected Age" was sixty, Note at 3; Opp. at 2-3, and he was not "terminated by reason of death or permanent mental or physical incapacity."  Note at 3.

Conversion Date is ignored in the Complaint but that is immaterial: any Conversion Date before August 31, 2026, would create a Conversion Percentage of 0%."); Tr. at 42:11-21.  The Court will therefore proceed on the same assumption.  *See, e.g.*, *New York ex rel. TZAC, Inc. v. New Israel Fund*, 520 F. Supp. 3d 362, 387 n.14 (S.D.N.Y. 2021) (accepting parties' framing in deciding motion to dismiss).

Assuming that the Conversion Date predates August 31, 2026, both parties agree that Plaintiff's Conversion Percentage would be zero (resulting in a Termination Amount of zero) but for a savings clause in the term's definition.  *See* Note at 2-3.  The clause provides that "if [Pujals] remains employed by [BDO] until [Pujals]'s retired date after age sixty-two (62), the Conversion Percentage shall be one hundred percent (100%)."  *Id.* at 3.  Plaintiff contends that this clause applies to him because (1) he was sixty-two when BDO terminated his employment, and (2) "[b]y virtue of this termination, Plaintiff retired from BDO on February 7, 2025, albeit involuntarily[.]"  Am. Compl. ¶¶ 22; *see id.* ¶ 48; Opp. at 20.  Defendant counters that the savings clause does not apply because (1) "retired date" refers to a specific date that is referenced in external documents and (2) setting aside that fact, the clause cannot apply to Plaintiff because he did not retire — he was terminated.  Br. at 8-9; Reply at 4.  The issue before the Court, then, is the meaning of the phrase "retired date" in the Note's savings clause.  Note at 3.

"Under New York law, 'the objective of contract interpretation is to give effect to the expressed intentions of the parties, and the best evidence of what parties to a written agreement intend is what they say in their writing.'"  *Walmart Inc. v. Cap. One, Nat'l Ass'n*, 725 F. Supp. 3d 450, 462 (S.D.N.Y. 2024) (alteration adopted) (quoting *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010)).  It is thus "axiomatic that . . . 'a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'"  *Doe v. UMG Recordings, Inc.*, No. 25-cv-02745 (NRB), 2025 WL

3268803, at *4 (S.D.N.Y. Nov. 24, 2025) (quoting *Greenfield v. Philles Recs., Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002)); *see also Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) ("The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." (alterations adopted) (quoting *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012))). "Contract language is unambiguous if there is only one reasonable interpretation of the agreement." *Orlando v. Nxt-ID Inc.*, No. 20-cv-01604 (MKV), 2022 WL 976875, at *5 (S.D.N.Y. Mar. 31, 2022); *accord Greenfield*, 780 N.E.2d at 170-71. In contrast, "[a]mbiguity exists if the contract terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Hertz Glob. Holdings, Inc. v. Nat'l Union Fire Ins. Co.*, 530 F. Supp. 3d 447, 453-54 (S.D.N.Y. 2021) (quoting *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010)).

"Whether an agreement is ambiguous is a question of law for the courts." *Louie v. Plissner*, 107 N.Y.S.3d 129, 131 (N.Y. App. Div. 2019) (quoting *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998)); *accord Hertz Glob. Holdings, Inc.*, 530 F. Supp. 3d at 453. "At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." *Orchard Hill Master Fund Ltd. v. SBA Commun. Corp.*, 830 F.3d 152, 156 (2d Cir. 2016); *accord Vectron Int'l, Inc. v. Corning Oak Holding, Inc.*, 964 N.Y.S.2d 724, 726 (N.Y. App. Div. 2013).

Plaintiff contends that the term "retired date," as used in the Note, refers to "the date Pujals' professional career ends—whenever and however that may be" — after attaining the age of sixty-two. Opp. at 2. In the alternative, Plaintiff maintains that, at a minimum, the phrase is

10

ambiguous, such that dismissal at this stage is inappropriate. *Id.* Defendant, by contrast, argues that "retired date" refers to a specific date noted in Plaintiff's Section 83(b) Election under the Internal Revenue Code. Br. at 8-9 & n.6; Dkt. 22-3 ("Section 83(b) Election"). Defendant alternatively contends that Plaintiff's construction of "retired date" is implausible as a matter of law. Reply at 3-4. At this juncture, the Court finds that "retired date" is not clear and unambiguous for purposes of interpreting the Note's savings clause.

Taking Defendant's reading first, Defendant argues that Plaintiff's "retired date" is a defined date, June 30, 2027, based on Plaintiff's Section 83(b) Election, of which the Court should take judicial notice. Br. at 8-9 & n.6. Plaintiff objects to the consideration of the Section 83(b) Election at the motion to dismiss stage because it is extrinsic to the Amended Complaint. Opp. at 4-5 & n.3. The Court agrees that the Section 83(b) Election may not be considered at this stage.

The Second Circuit has made clear that a court may only take judicial notice of publicly filed documents not "offered for the truth of the matter asserted," but instead offered for other relevant reasons, such as "to show that certain things were said in the press, and that assertions were made in lawsuits and regulatory filings." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). The Court would thus be unable to take judicial notice of the Section 83(b) Election to establish that Plaintiff's "retired date" was June 30, 2027 for purposes of this motion to dismiss. *See Chiaramonte v. Animal Med. Ctr.*, No. 13-cv-05117 (KPF), 2014 WL 3611098, at *4 (S.D.N.Y. July 22, 2014) ("Judicial notice may be taken of documents outside the pleadings to establish the fact of their existence and the scope, but not the truth of their content." (citing *Staehr*, 547 F.3d at 425 (collecting cases))).

More importantly, though, even if the Court were to consider the Section 83(b) Election, the Note does not reference it, or any tax election for that matter. *See generally* Note. There is

thus no textual support for Defendant's argument that "retired date" is defined by reference to a tax filing, and the Note's language does not provide a basis to conclude that "retired date" plainly means June 30, 2027.

With respect to Plaintiff's interpretation, the Court also does not agree with Plaintiff that the Note unambiguously equates "retired date" with the date of his termination or "involuntar[y]" retirement on February 7, 2025. Am. Compl. ¶ 22. As Plaintiff correctly observes, although "[t]he Promissory Note includes 28 defined terms[,] . . . '[r]etired date' is not one of them." Opp. at 9. In the absence of a contractual definition, "[c]ourts may refer to the dictionary to determine the plain and ordinary meaning of contract terms." *Dish Network Corp. v. Ace Am. Ins. Co.*, 21 F.4th 207, 211 (2d Cir. 2021) (internal quotation marks and citation omitted); *see also Mazzola v. Cnty. of Suffolk*, 533 N.Y.S.2d 297, 297 (N.Y. App. Div. 1988) ("[I]t is common practice for the courts of [New York] State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract."). Having done so, at least one New York court has concluded that "implicit in the term retire[d] is that it involves a *voluntary* withdrawal from the workplace." *Garcia v. Garcia*, 941 N.Y.S.2d 537 (Table) (N.Y. Sup. Ct. 2011) (emphasis added); *see, e.g.*, *Retired*, Merriam-Webster, https://www.merriam-webster.com/dictionary/retired (last visited Feb. 6, 2026) (meaning "withdrawn from one's position or occupation : having concluded one's working or professional career"); *Laurent v. PricewaterhouseCoopers LLP*, 794 F.3d 272, 281 (2d Cir. 2015) ("'[R]etire' means, *inter alia*, 'to withdraw from business or public life and live on one's income, savings, or pension.'" (alteration adopted) (quoting Am. Heritage Dictionary 848, 1055 (2d ed. 1982))); *Gratian v. Gen. Dynamics, Inc.*, 587 F.2d 121, 123 (2d Cir. 1978) (finding that 'retire' "means to withdraw from business or occupation or active duty"). However, it is also possible that retirement does not necessarily mean a voluntary action by the employee and instead refers to permanent

12

cessation of employment, which could include involuntary retirement.  *See, e.g.*, *Retired*, Oxford English Dictionary, https://www.oed.com/dictionary/retired_adj (last visited Feb. 6, 2026) ("Of a person: that has left office, employment, or service permanently, now esp. on reaching pensionable age; that has stopped working."); *Compulsory Retirement*, Black's Law Dictionary (10th ed. 2014) ("Mandatory retirement based on a person's age, esp. as specified in a union contract, by corporate policy, or by statute"); *see also, e.g.*, *Wyper v. Providence Washington Ins. Co.*, 533 F.2d 57, 61-62 (2d Cir. 1976) (discussing pension plan which provided an employee "may be retired" by the pension board); *Allen v. Colgate-Palmolive Co.*, 539 F. Supp. 57, 64 (S.D.N.Y. 1981) (discussing retirement plan which stated employer's right "to retire any employee" shall not be impaired); *In re Gen. DataComm Indus., Inc.*, 407 F.3d 616, 622 (3d Cir. 2005) (concluding that "the particular facts of this case are compelling enough to warrant" interpreting the term "retired employees" in 11 U.S.C. § 1114 to encompass "forced retirement").  Thus, the phrase "retired date" does not necessarily foreclose application of the savings clause to Plaintiff's involuntary retirement from the workforce.  Am. Compl. ¶ 22 ("By virtue of this termination, Plaintiff retired from BDO on February 7, 2025, albeit involuntarily[.]").  In line with that understanding, Plaintiff asserts that his "professional career ended on February 7, 2025," the date he was terminated and "after he had reached the age of 62," Opp. at 10, and that BDO has since referred to him as one of the "BDO Retired Partners and Principals," Am. Compl. ¶ 75; Dkt. 49-4 ("BDO Email").

Admittedly, there are textual complications with interpreting "retired date" solely to mean the date Plaintiff's employment at BDO was terminated after age sixty-two because the inclusion of "retired date" in the savings clause appears to establish a distinct requirement from termination, which is covered by Article V generally.  *LaBarbera v. N.Y.C. Dept. of Educ.*, 240 N.Y.S.3d 742, 745 (N.Y. App. Div. 2025) ("'[A] court should not read a contract so as to render

any term, phrase, or provision meaningless or superfluous,' but should give effect to all of the contract's provisions." (quoting *Givati v. Air Techniques, Inc.*, 960 N.Y.S.2d 196, 198 (N.Y. App. Div. 2013)).  However, at this juncture, because "retired date" is undefined in the Note, and it is plausible that it could mean, as Defendant asserts, a previously specified date, or, as Plaintiff asserts, the date Plaintiff's actual retirement occurs after age sixty-two, the Court cannot conclude at this stage that the Note is free from ambiguity.  Indeed, at oral argument, defense counsel was unable to provide an affirmative definition of "retired date" based on the Note's text.  Tr. at 9:10-14:18 (stating in response to repeated questions that "I think that unless we can go to the 83(b) election . . . there's certainly arguably an ambiguity there").  Thus, the savings clause is ambiguous, and the parties' intent and the meaning they ascribed to "retired date" in the Note cannot be resolved based solely on the Note's plain language.  The motion to dismiss therefore cannot be granted on the basis that Plaintiff is not entitled to the savings clause's protection.  *See Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 178 (2d Cir. 2004) ("[I]f a contract is ambiguous . . . , a court has insufficient data to dismiss a complaint for failure to state a claim."); *Vectron Int'l*, 964 N.Y.S.2d at 726 ("In the context of a motion to dismiss, if the contract's language is ambiguous, then the motion must be denied to permit the parties to discover and present extrinsic evidence of the parties' intent.").

With that understanding in mind, the Court turns to Plaintiff's specific theories of breach.

### A.    Failure to Pay Interest

Plaintiff alleges that, following the termination of his employment, Defendant has failed to make monthly interest payments provided for under Section 2.1 of the Note.  Am. Compl. ¶ 85.  Defendant responds that no such interest payments were due because "[i]nterest on a zero sum is itself zero."  Suppl. Br. at 2.

14

In resolving the parties' dispute, the Court once again turns to the Note itself. Under Section 2.1(b), BDO was obligated to "pay interest on the unpaid principal," which was to be distributed "monthly in arrears on the first Business Day following the end of each calendar month." Note § 2.1(b). The Note further provided that "until August 31, 2025, fifty percent (50%) of the monthly interest shall be paid to [Pujals] by [BDO] in cash and the remaining fifty percent (50%) shall be added to the principal balance of this Note on such payment date." *Id.* However, upon terminating Plaintiff's employment, BDO was entitled to exercise its conversion rights through delivery of a written Conversion Notice to Pujals. *Id.* at 6-7. In so doing, BDO would automatically establish the Conversion Date,[4] thereby triggering calculation of the Termination Amount and associated Conversion Amount. *See id.* at 2-4, 7.

As discussed *supra*, absent application of the savings clause, both the Termination Amount and the Conversion Amount would be zero if the Conversion Date preceded August 31, 2026. *Id.* 2-3. Defendant is therefore correct that, if the savings clause is ultimately found not to apply to Plaintiff, then BDO exercising its conversion rights prior to August 1, 2026, would zero out Plaintiff's principal. Suppl. Br. at 2. Such zeroing out would also eliminate Plaintiff's entitlement to the fifty percent of his monthly interest that had, up to that point, been withheld and applied to the Note's principal. *See* Note § 2.1(b).

Plaintiff's theory of breach is premised entirely on the application of the savings clause to his circumstances. In his Amended Complaint, Plaintiff alleges that "BDO failed to pay interest that was due for the month of March 2025 when due," "has failed to make the monthly interest payments for each and every month thereafter," and "has not paid Plaintiff the 50% of interest

---

[4] The Conversion Date is the date that the conversion occurs and must be "within thirty (30) days after the date of the Conversion Notice." Note at 7. Accordingly, while delivery of the Conversion Notice would not establish the specific Conversion Date, it would establish the latest possible Conversion Date (*i.e.*, 30 days after delivery of the Conversion Notice).

15

due to him that was withheld." Am. Compl. ¶¶ 85, 87.  Because application of the savings clause to Plaintiff's circumstances is not plainly foreclosed by the Note's language, *see supra* Part I, Plaintiff states a claim for breach of the Note by failure to pay interest at this juncture.

### B.      Failure to Pay Principal Under the Acceleration Clause

Plaintiff additionally alleges that Section 3.2(a) of the Note is an acceleration clause, making all outstanding principal and accrued interest immediately due if interest is not paid within thirty days — without the need for notice or a demand.  Am. Compl. ¶¶ 88-92. Accordingly, Plaintiff claims Defendant's failure to "pay the full amount of the Note with interest at the default rate" was a breach.  *Id.* ¶ 93.  Defendant argues that this theory fails for two reasons.  First, Defendant contends that this second theory is premised on the Court finding that Plaintiff successfully pled a claim for breach of the Note by failure to pay interest and fails for that reason alone.  Suppl. Br. at 2.  Second, BDO argues that Plaintiff has misread the Note and that Section 3.2(a) is triggered only by specific Events of Default, namely bankruptcy and similar insolvency events.  *Id.*  Because Plaintiff has not alleged any such event, no acceleration can occur.  *Id.*  As discussed above, Plaintiff states a claim for breach of the Note by failure to pay interest, foreclosing Defendant's first argument.  But Defendant is correct that Plaintiff invokes the wrong acceleration clause.  The Court therefore dismisses Plaintiff's claim for breach by failure to pay the principal.

Defendant rightly observes that Plaintiff misreads Section 3.2(a).  Section 3.1 of the Note defines various "Events of Default":

> The occurrence of any of the following events shall constitute a default (each, an "Event of Default") hereunder: (a) the failure of [BDO] to make payment of principal or interest within thirty (30) days of the same becoming due and payable in the amount specified herein; <u>provided</u> that such failure shall not constitute an Event of Default hereunder if such payment is prohibited pursuant to the Subordination Terms or would have resulted in a default under the Senior Credit Documents, or (b) bankruptcy, reorganization or insolvency proceedings (or other

16

> Insolvency Event) are instituted by or against [BDO] (by any party other than [Pujals]) and, if instituted against [BDO], such proceedings are consented to or are not dismissed within sixty (60) days after such institution.

Note § 3.1.  Failure to make timely interest payments is defined as an Event of Default under Section 3.1(a).  *Id.* § 3.1(a).  Meanwhile, Section 3.1(b) defines "bankruptcy, reorganization or insolvency proceedings" as additional Events of Default.  *Id.* § 3.1(b).  The subsequent remedies section distinguishes between the two categories.  That is, Section 3.2(a)'s automatic acceleration provision applies *only to* "an Event of Default of the type described in clause (b) of Section 3.1," which excludes failure to pay interest.  *Id.* § 3.2(a).  Thus, Defendant's failure to pay interest could not have triggered Section 3.2(a).

Perhaps recognizing this pleading deficiency, Plaintiff sought to supplement his allegations through his briefing.  In his Supplemental Opposition, Plaintiff argued — for the first time — that even if no Insolvency Event has occurred to trigger Section 3.2(a) of the Note, Section 3.2(b) nevertheless allows Plaintiff, at his sole discretion, to elect "any and all rights and remedies provided at law or in equity."  Suppl. Opp. at 3 (quoting Note § 3.2(b)).  This alternative claim under Section 3.2(b) cannot be considered since Plaintiff only raised it in his briefing.  *See Diego Beekman Mut. Hous. Ass'n Hous. Dev. Fund Corp. HDFC v. Dish Network, L.L.C.*, No. 15-cv-01094 (KPF), 2016 WL 1060328, at *3 (S.D.N.Y. Mar. 15, 2016) ("[A] party cannot cure pleading defects by advancing allegations in opposition to a motion to dismiss." (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)).  Plaintiff's claim for breach of the Note by failure to pay the principal is therefore dismissed, but he shall be granted leave to amend.

## II.    Anticipatory Breach of the Warrant

Because the Warrant's savings clause is identical to that of the Note, Plaintiff's anticipatory breach claim likewise survives Defendant's motion to dismiss.

A.      **Choice of Law**

As an initial matter, the Court must address the state law applicable to the Warrant.  The parties differ over which of the Warrant's two choice-of-law clauses apply.  Section 13 of the Warrant, titled "Applicable Law and Jurisdiction," provides that "[t]his Warrant and all matters related hereto shall in all respects be governed by and construed in accordance with the laws of the State of Virginia."  Warrant § 13.  Attached to the Warrant is Exhibit E, the "Subordination Terms."  *Id.* at E-1.  The Subordination Terms contain a governing law provision, which states that "THESE SUBORDINATION TERMS SHALL BE INTERPRETED AND THE RIGHTS OF THE OBLIGORS, THE SUBORDINATED CREDITOR AND THE SENIOR CREDITORS DETERMINED IN ACCORDANCE WITH THE INTERNAL LAWS (AS OPPOSED TO THE CONFLICT OF LAWS PROVISIONS) OF THE STATE OF NEW YORK."  *Id.* at E-13, § 19.  Relevant here, "Subordinated Creditor" is defined "for the purposes of th[e] Exhibit" as "the holder of the Warrant to which th[e] Exhibit is attached," meaning Pujals.  *Id.* at E-4.

Defendant asserts that New York law governs because (1) Section 19 of the Warrant contains a subordination clause providing that "rights and obligations . . . of [BDO] and [Pujals] are subject to the Subordination Terms," *id.* § 19; (2) the Subordination Terms, in turn, dictate a New York choice of law, *id.* at E-13, § 19; and (3) the Subordination Terms further provide that "in the event of any inconsistency between" the Warrant's terms and those of the Subordination Terms, the latter's terms shall govern, *id.* at E-13, § 18.  Reply at 1-2.  Meanwhile, Plaintiff contends that Virginia law should apply because the choice-of-law clause within the Warrant, rather than its exhibit, dictates as such.  *See* Opp. at 19 n.16.  Plaintiff's interpretation best comports with the Warrant's terms.

"The validity of a contractual choice-of-law clause is a threshold question that must be decided not under the law specified in the clause, but under the relevant forum's choice-of-law

18

rules governing the effectiveness of such clauses." *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332 (2d Cir. 2005). "New York courts decide the scope of such clauses under New York law, not under the law selected by the clause[.]" *Id.* at 333; *see, e.g.*, *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (applying New York law to interpret Massachusetts choice-of-law clause).

Because New York law governs the interpretation of the choice-of-law clauses, the Court examines whether the terms have a plain meaning on their face, *see Walmart Inc.*, 725 F. Supp. 3d at 462, and concludes that they do. It is a "cardinal principle of contract construction that a document should be read to give effect to all its provisions and to render them consistent with each other," and, accordingly, "all provisions of a contract [should] be read together as a harmonious whole, if possible." *Perreca v. Gluck*, 295 F.3d 215, 224 (2d Cir. 2002) (alteration adopted) (first quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995); and then quoting *Kinek v. Paramount Commc'ns, Inc.*, 22 F.3d 503, 509 (2d Cir. 1994)); *accord Smith v. City of Buffalo*, 992 N.Y.S.2d 816, 817 (N.Y. App. Div. 2014); *see also O'Connor v. Soc'y Pass Inc.*, 221 N.Y.S.3d 46, 52 (N.Y. App. Div. 2024) ("Stock warrants are enforceable contracts entitling the holder to purchase a specified number of shares of stock for a specific price during a designated time period." (internal quotation marks and citation omitted)). The Warrant clarifies that "[the] Warrant, together with the Exhibits attached [t]hereto, constitutes the entire agreement among the parties [t]hereto with respect to the subject matter [t]hereof." Warrant § 16. Viewing the agreement as a whole, Defendant's proffered interpretation of the choice-of-law provisions would render the Virginia choice-of-law provision in Section 13 of the Warrant entirely superfluous. The Court cannot adopt such a construction when Plaintiff's alternative construction "give[s] effect to all [of the Warrant's] provisions" and "render[s] them consistent with each other." *Perreca*, 295 F.3d at 224; *see Perlbinder v. Bd. of Managers of 411*

19

*E. 53rd St. Condo.*, 886 N.Y.S.2d 378, 381 (N.Y. App. Div. 2009) ("In construing a contract, [a]n interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation." (internal quotation marks and citation omitted)).

Under Plaintiff's construction of the Warrant, the Virginia choice-of-law provision applies to the Warrant itself "and all matters related [t]hereto." Warrant § 13. Meanwhile, the New York choice-of-law provision governs the Subordination Terms and any disputes arising therefrom — including any disputes arising from the Warrant's terms that *conflict* with the rights of "the Obligors," Pujals (in his capacity as the Subordinated Creditor), or "the Senior Creditors" under the Subordination Terms. *Id.* at E-13, §§ 18, 19 (citation modified). At this stage, Plaintiff's claims with respect to the Warrant do not pose any "inconsistency between the terms of the Warrant and the[] Subordination Terms," *id.* at E-13, § 18, so the Court will apply Virginia law in analyzing both.[5]

### B.    Anticipatory Breach Under Virginia Law

"Under Virginia law, it is well established that 'if one party to a contract declares in advance that he will not perform at the time set for his performance, the other party may bring an immediate action for total breach of contract.'" *State Farm Fire & Cas. Co. v. Richards*, No. 24-cv-00803, 2025 WL 2722658, at *2 (E.D. Va. Sept. 24, 2025) (quoting *City of Fairfax v. Wash. Metro. Area Transit Auth.*, 582 F.2d 1321, 1325 (4th Cir. 1978)). "[T]he repudiation must be

---

[5] In New York, "[c]hoice-of-law clauses will be enforced 'so long as the chosen law bears a reasonable relationship to the parties or the transaction.'" *Askari v. McDermott, Will & Emery, LLP*, 114 N.Y.S.3d 412, 428 (N.Y. App. Div. 2019) (quoting *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 859 N.E.2d 498, 500 (N.Y. 2006)). Plaintiff was employed at Defendant BDO, which is organized under the laws of Virginia, Dkt. 6 at 2. The Court therefore finds that the Virginia choice-of-law clause bears a reasonable relationship to the parties. *See, e.g.*, *Burns v. Delaware Charter Guarantee & Tr. Co.*, 805 F. Supp. 2d 12, 22 (S.D.N.Y. 2011) (applying Delaware choice-of-law clause where the defendant corporation was incorporated in Delaware).

clear, absolute, unequivocal, and must cover the entire performance of the contract." *Bennett v. Sage Payment Sols., Inc.*, 710 S.E.2d 736, 742 (Va. 2011) (quoting *Vahabzadeh v. Mooney*, 399 S.E.2d 803, 805 (Va. 1991)). Importantly, "[w]hether the repudiation is 'sufficiently positive or unequivocal to give rise to a cause of action for anticipatory breach' is a question of fact for the jury." *Under Wild Skies, Inc. v. Nat'l Rifle Ass'n of Am.*, 915 S.E.2d 514, 517 (Va. 2025) (quoting *Bd. of Supervisors of Fairfax Cnty. v. Ecology One, Inc.*, 245 S.E.2d 425, 428 (Va. 1978)).

Plaintiff claims that Defendant anticipatorily breached the Warrant by "advis[ing] Plaintiff that it believed it owed him nothing under the . . . Warrant" and that "Plaintiff has no rights" thereunder. Am. Compl. ¶¶ 72, 105. Defendant argues that Plaintiff's claim should be dismissed because he is, in fact, not owed anything under the Warrant. Br. at 5. That is, Defendant asserts that it has not repudiated any obligation because it has no obligation to repudiate. Because the Warrant's savings clause tracks the Note's identical savings clause, the Court concludes that it cannot dismiss Plaintiff's claim for anticipatory breach of the Warrant given the ambiguity of the contract language.

The Warrant entitles Plaintiff to purchase 45,722.849082 shares in BDO at a strike price of $58 per share. Warrant at 1. Both Plaintiff and BDO may call the Warrant, albeit under different conditions. With respect to Plaintiff, Section 1(a) provides that Plaintiff must call the Warrant by the earlier of two events: (1) "the tenth (10th) anniversary of the Original Issue Date," (*i.e.*, August 31, 2033); or (2) "in connection with a Change of Control at any time prior to the Expiration Date [of August 31, 2033]." *Id.* § 1(a)(i)-(ii). To exercise the Warrant at any point during such Exercise Period, Plaintiff must "deliver to [BDO] a completed and signed notice of exercise," attached to the Warrant as Exhibit A, "at least thirty (30) days prior to the proposed Exercise Date." *Id.* § 1(b) (describing "Notice of Exercise"). Thereafter, on the Exercise Date,

Plaintiff may acquire his desired number of shares at the Exercise Price, *id.*, which is "$58 per share, subject to adjustments pursuant to Section 3 of th[e] Warrant," *id.* at 1.  BDO may, however, "elect, in lieu of receiving the Exercise Price and delivering a certificate or certificates representing shares of Common Stock . . . , to purchase th[e] Warrant by paying [Pujals] an amount equal to the Warrant Purchase Price."  *Id.* § 1(c).

Additionally, rather than exercise the Warrant, "[a]t any time during the Exercise Period, [Pujals] may . . . require [BDO], subject to the Subordination Terms, to purchase ("**Put**") all or any portion of th[e] Warrant."  *Id.* § 1(d).  To exercise his put rights, Plaintiff must likewise deliver to BDO "a written notice of [his] election to Put th[e] Warrant," which must take the form of the Warrant's Exhibit B.  *Id.* (describing "Put Notice").  The date of the Put Notice's delivery is the Put Date.  *Id.*  "Upon receipt of the Put Notice, [BDO] shall, subject to the Subordination Terms, pay [Pujals] an amount equal to the Warrant Purchase Price."  *Id.*

With respect to BDO, Section 1(e) of the Warrant grants the company, "subject to the Subordination Terms," "the right, at its option, to call th[e] Warrant on the earliest of": (1) "repayment in full of the Seller Notes," which includes the Note, *id.* at 1; (2) "a Change of Control;" (3) "[Pujals]'s retirement or termination of [Pujals]'s employment with [BDO];" or (4) "exercise of th[e] Warrant."  *Id.* § 1(e).  To exercise its call rights, BDO must "deliver to [Pujals] a written notice" that includes "a description of the event triggering [BDO]'s call rights."  *Id.* (describing "Call Notice").  The date of the Call Notice's delivery is the Call Date. *Id.*

As with the Note, Defendant's repudiation of its obligations under the Warrant is premised on a single term, the Warrant Purchase Price.  And much like the Conversion Amount in the Note, the Warrant Purchase Price is derived through a formula consisting of various defined terms:



*Id.* at 14-15.  Again in dispute is Plaintiff's "Conversion Percentage": a variable that ranges from 0% to 100% depending on the difference in time between the Warrant's "Original Issue Date" (August 31, 2023, *id.* at 1) and the Warrant's "Call Date" or "Put Date."  *Id.* at 13-14.  The range of possible values is as follows:

| Call or Put Date | Conversion Percentage |
| --- | --- |
| Before August 31, 2026 | 0% |
| Between August 31, 2026 and August 31, 2027 | 80% |
| Between August 31, 2027 and August 31, 2028 | 90% |
| After August 31, 2028 | 100% |

*Id.*

Defendant's argument for dismissal of Plaintiff's anticipatory breach claim is premised on BDO's ability to "call the Warrant upon Pujals's termination for the 'Warrant Purchase Price.'"  Br. at 4.  That is, if BDO issued a Call Notice before August 31, 2026, then the Conversion Percentage and, in turn, the Warrant Purchase Price, would be zero.  *Id.*  According to Defendant, if the Warrant is, in fact, worth nothing, then Defendant's assertion that "Plaintiff has no rights under the Warrant," Am. Compl. ¶ 105, could not constitute an anticipatory breach.

Plaintiff's opposition is premised solely on application of the Warrant's savings clause, which is the same as that of the Note. Because Virginia and New York law apply the same principles of contractual interpretation, the Court's finding that application of the Note's savings clause to Plaintiff is not clearly foreclosed applies with equal force to that of the Warrant.

"In Virginia, the interpretation of a contract is a question of law." *Vir2us, Inc. v. Sophos Inc.*, No. 21-1402, 2023 WL 2136379, at \*3 (4th Cir. Feb. 21, 2023) (per curiam); *accord PMA Cap. Ins. Co. v. US Airways, Inc.*, 626 S.E.2d 369, 372 (Va. 2006). "The question of whether a contract is ambiguous is also a question of law to be decided by the court." *Plum Creek Timberlands, L.P. v. Yellow Poplar Lumber Co., Inc.*, No. 13-cv-00062, 2016 WL 6837173, at \*3 (W.D. Va. Nov. 21, 2016); *accord Langman v. Alumni Ass'n of Univ. of Va.*, 442 S.E.2d 669, 674 (Va. 1994). "Under Virginia law, [courts] 'must give effect to the intention of the parties as expressed in the language of their contract.'" *Norfolk S. Ry. Co. v. Zayo Grp., LLC*, 87 F.4th 585, 589 (4th Cir. 2023) (quoting *Martin & Martin, Inc. v. Bradley Enters., Inc.*, 504 S.E.2d 849, 851 (Va. 1998)). "It is axiomatic that when the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning." *TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 325 (Va. 2012) (quoting *Barber v. VistaRMS, Inc.*, 634 S.E.2d 706, 712 (Va. 2006)); *accord Vir2us, Inc.* 2023 WL 2136379, at \*3. "No word or clause in a contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *Heron v. Transp. Cas. Ins. Co.*, 650 S.E.2d 699, 702 (Va. 2007); *accord Nijjar v. Dr.'s Assocs., Inc.*, 718 F. App'x 213, 214 (4th Cir. 2018) (per curiam). However, "[w]hen presented with an ambiguous contractual provision, a district court may not resolve the ambiguity at the motion to dismiss stage." *Winners Circle Imports, LLC v. Whitney's Auto. Venture Enter., LLC*, No. 24-cv-718, 2025 WL 2856525, at \*7 (E.D. Va. Oct. 8, 2025); *accord Martin Marietta Corp. v. Int'l Telecomms. Satellite Org.*, 991 F.2d 94, 97 (4th Cir.

24

1992); *Online Res. Corp. v. Lawlor*, 736 S.E.2d 886, 894 (Va. 2013).  "A contract term stands ambiguous when it can reasonably carry 'two or more meanings, be understood in more than one way, or refer to two or more things at the same time.'"  *Virginia is for Movers, LLC v. Apple Fed. Credit Union*, 720 F. Supp. 3d 427, 436 (E.D. Va. 2024) (alterations adopted) (quoting *Aetna Cas. & Sur. Co. v. Fireguard Corp.*, 455 S.E.2d 229, 232 (Va. 1995)).  Put simply, courts in Virginia and New York apply the same principles in interpreting contracts.

Accordingly, the Court's interpretation of the Note's savings clause equally applies to the Warrant's savings clause, and for all of the reasons set forth above, *see supra* Part I, the Court finds that the Warrant's terms do not unambiguously foreclose Plaintiff's claim.  *See, e.g.*, *Travelers Indem. Co. of Am. v. Portal Healthcare Sols., LLC*, 35 F. Supp. 3d 765, 770 (E.D. Va. 2014) ("Virginia courts customarily turn to dictionaries for help in deciphering a term's plain meaning."), *aff'd sub nom.*, *Travelers Indem. Co. of Am. v. Portal Healthcare Sols., L.L.C.*, 644 F. App'x 245 (4th Cir. 2016) (per curiam); *accord Tomlin v. Commonwealth.*, 888 S.E.2d 748, 756 (Va. 2023).

Plaintiff has therefore pled a claim for anticipatory breach.

## III.    Breach of the Implied Covenant of Good Faith and Fair Dealing

With respect to Plaintiff's implied covenant claims, Defendant contends that Plaintiff's claims are barred as a matter of law and, in any event, are impermissibly duplicative of the contractual breach claims.  Br. at 10-15; Reply at 5-8.  The Court agrees that the implied covenant claims are barred as a matter of New York and Virginia law and must be dismissed.  Defendant's arguments regarding duplication are therefore moot.

### A.    The Promissory Note

"Under New York law, a covenant of good faith and fair dealing is implicit in all contracts during the course of contract performance.  The covenant 'embraces a pledge that

neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) (quoting *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995)). "To state a claim for breach of this covenant, a plaintiff must plead that (1) the defendant owes the plaintiff a duty to act in good faith and conduct fair dealing; (2) the defendant breached that duty; and (3) the breach of duty proximately caused the plaintiff's damages." *Great Lakes Reinsurance (UK) SE v. Herzig*, 413 F. Supp. 3d 177, 183 (S.D.N.Y. 2019) (citation modified).

The parties' dispute whether Plaintiff's status as an at-will employee forecloses his ability to plead breach here. *See* Am. Compl. ¶ 52 ("[E]mployees of BDO are at will employees[.]"). Defendant argues that pursuant to the New York Court of Appeals' reasoning in *Gallagher v. Lambert*, 549 N.E.2d 136 (N.Y. 1989), "[w]here the employment is at-will, there is no viable claim for breach of an implied covenant even where termination causes a loss of another benefit." Br. at 11. In particular, the *Gallagher* court held that an allegation that an employer fired an at-will employee to avoid paying him a higher price for stock options did not state a claim under the implied covenant. 549 N.E.2d at 137-38. Plaintiff counters that the Second Circuit's reasoning in *Wakefield v. Northern Telecom, Inc.*, 769 F.2d 109 (2d Cir. 1985), which predates *Gallagher*, is more apt. Opp. at 16. There, the Second Circuit found an implied covenant of good faith and fair dealing where an employer allegedly terminated an at-will employee to avoid paying him his earned sales commission. *Wakefield*, 769 F.2d at 112-13. The court reasoned that where "a covenant of good faith is necessary to enable one party to receive the benefits promised for performance, it is implied by the law as necessary to effectuate the intent of the parties." *Id.* at 112.

"On matters of state law, the Court must follow the decisions of the state's highest court." *Citibank, N.A. v. Aralpa Holdings Ltd.*, 714 F. Supp. 3d 416, 431 (S.D.N.Y. 2024) (citing *Johnson v. Fankell*, 520 U.S. 911, 916 (1997)).  While Plaintiff fairly observes that "[c]ourts have struggled to reconcile *Gallagher* and *Wakefield*," Opp. at 16 n. 13, that struggle appears to be narrowly confined to the sales commission context, *see, e.g.*, *Baguer v. Spanish Broad. Sys., Inc.*, No. 04-cv-08393 (KMK), 2007 WL 2780390, *10-11 (S.D.N.Y. Sept. 20, 2007) (rejecting *Wakefield* while also distinguishing *Gallagher* in sales commission context); *Houlahan v. Raptor Trading Sys., Inc.*, No. 16-cv-09620 (PGG), 2018 WL 3231662, at *8 (S.D.N.Y. Feb. 12, 2018) ("The majority of courts in this District have continued to apply *Wakefield*, but have limited its application to the sales commission context." (collecting cases)).  Sales commissions are not at issue here.  The Court therefore finds persuasive the distinction drawn in *Knudsen v. Quebecor Printing (U.S.A.) Inc.*, 792 F. Supp. 234 (S.D.N.Y. 1992).

In *Knudsen*, the court distinguished between the buy-back provision for employee stock in *Gallagher* and the provisions governing sales commissions in *Wakefield*.  *Knudsen*, 792 F. Supp. at 239.  The court reasoned that "[a] sales commission provision provides for an employer to pay its employees commissions earned through the employees' own efforts," whereas "a stock buy-back provision affords employees a form of compensation that is related merely to the employees' length of tenure."  *Id.*  It further observed that the Second Circuit's recognition of an implied covenant of good faith and fair dealing in *Wakefield* is less compelling in the buy-back provision context because such provisions "do not relate as directly to the efforts of employees as do sales commission provisions."  *Id.*

Like the buy-back provisions in *Gallagher*, the Note afforded Plaintiff "a form of compensation that . . . related merely to [his] length of tenure."  *Id.*  "The [conversion] formula was designed for the benefit of both parties precisely so that they could know their respective

27

rights on certain dates and avoid costly and lengthy litigation[.]" *Gallagher*, 549 N.E.2d at 138. Plaintiff's entitlement to the full Conversion Amount was contingent on him reaching his Selected Age of sixty and remaining employed at BDO for over five years, or, per the savings clause, on him remaining employed until his "retired date" sometime after turning sixty-two. Note at 2-4. The Note simply "do[es] not relate as directly to [his] efforts [as an] employee[] as do sales commission provisions." *Knudsen*, 792 F. Supp at 239. Thus, pursuant to *Gallagher*, Plaintiff, as an at-will employee, has no legal right to the full Conversion Amount, as there was "no guarantee, contractual or otherwise, that [BDO] would not act in [its] own self-interest or that [Pujals]'s employment would continue until such time as he could avail himself of the [Note's full value]." *Gallagher v. Lambert*, 532 N.Y.S.2d 255, 257 (N.Y. App. Div. 1988), *aff'd*, 549 N.E.2d 136 (N.Y. 1989). Plaintiff's good faith and fair dealing claim thus fails as a matter of law.

### B.    The Warrant

"Under Virginia law, every contract contains an implied covenant of good faith and fair dealing; however, a breach of those duties only gives rise to a breach of contract claim, not a separate cause of action." *Carr v. Fed. Nat'l Mortg. Ass'n*, 92 Va. Cir. 472 (Va. Cir. 2013) (quoting *Frank Brunckhorst Co., L.L.C. v. Coastal Atl., Inc.*, 542 F. Supp. 2d 452, 462 (E.D. Va. 2008)); *accord Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*, 144 F.4th 238, 251 (4th Cir. 2025). "[A] claim for breach of the implied covenant of good faith and fair dealing requires (1) a contractual relationship between the parties and (2) a breach of the implied covenant." *Perez v. Cenlar, C. Loan Admin. & Reporting*, 109 Va. Cir. 441 (Va. Cir. 2022); *accord Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009). The implied covenant provides that "when a party exercises contractual rights, it may not do so dishonestly or in bad faith." *Brainchild Surgical Devices, LLC*, 144 F.4th at 251.

28

Fatal to Plaintiff's claim, however, is that "Virginia law 'does not recognize a cause of action for breach of an implied covenant of good faith and fair dealing in employment contracts, and in at-will employment contracts in particular.'" *Chapman v. Asbury Auto. Grp., Inc.*, No. 15-cv-679, 2017 WL 3324486, at *5 (E.D. Va. Aug. 3, 2017) (quoting *Devnew v. Brown & Brown*, *Inc.*, 396 F. Supp. 2d 665, 671 (E.D. Va. 2005)); *see also Devnew*, 396 F. Supp. 2d at 671 ("While the Court is sympathetic to [plaintiff]'s position, it is simply not empowered to broaden the scope of an implied covenant of good faith and fair dealing from the commercial context to the employment context."); *Nisbett v. Reconart, Inc.*, No. 16-cv-1467, 2017 WL 1745045, at *5 (E.D. Va. May 3, 2017) ("[N]either party can cite to a single case that has found the duty of good faith and fair dealing in any employment context."); *Harmon v. Dyncorp Int'l, Inc.*, No. 13-cv-1597, 2015 WL 518594, at *13-14 (E.D. Va. Feb. 6, 2015) (holding that a claim for breach of the implied covenant of good faith and fair dealing does not arise when an employer acts within its contractual discretion, even if done in bad faith), *aff'd*, 624 F. App'x 104 (4th Cir. 2015). Like the plaintiff in *Chapman*, Plaintiff alleges that "[BDO] terminated [his] employment to deprive him of the stock shares" to which he would have been entitled. *Chapman*, 2017 WL 3324486, at *4 (omission adopted); Am. Compl. ¶¶ 110-12. Thus, like Chapman, Plaintiff cannot state a claim for breach of the covenant of good faith and fair dealing as a matter of law. *Chapman*, 2017 WL 3324486, at *6; *cf. Leahy v. Comput. Scis. Corp.*, No. 14-cv-665 (JCC/TRJ), 2015 WL 631353, at *8 (E.D. Va. Feb. 12, 2015) (finding employer's decision to terminate employment relationship "arbitrarily, in bad faith, or on the basis of illegal discrimination" insufficient to entitle at-will employee to rights under "stock options agreement"). Plaintiff's final claim is, accordingly, dismissed.

## CONCLUSION

For the foregoing reasons, Counts III and IV of the Amended Complaint are DISMISSED with prejudice, and Count I is DISMISSED in part with leave to amend by **March 16, 2026**. Defendant's motion to dismiss is otherwise DENIED.  The discovery stay is hereby lifted, and the parties are to meet and confer and submit a proposed Amended Case Management Plan and Scheduling Order by **March 13, 2026**.

The Clerk of Court is respectfully directed to terminate the motion at Dkt. 20.

Dated:  March 2, 2026
         New York, New York

SO ORDERED.

_____
JENNIFER L. ROCHON
United States District Judge